# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MIDWAY GAMES INC., *et al.* | ) | Case No. 09-10465 (KG) |
| | ) | |
| Debtors. | ) | |
| | ) | |
| THE OFFICIAL COMMITTEE OF | ) | |
| UNSECURED CREDITORS OF | ) | |
| MIDWAY GAMES INC., *et al.*, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Proc. No. 09-50968 (KG) |
| | ) | |
| NATIONAL AMUSEMENTS INC., a | ) | |
| Maryland corporation, SUMCO INC., a | ) | |
| Delaware corporation, SUMNER M. | ) | |
| REDSTONE 2003 TRUST, SUMNER M. | ) | |
| REDSTONE, an individual, ACQUISITION | ) | |
| HOLDINGS SUBSIDIARY I LLC, a Delaware | ) | |
| limited liability company, MT ACQUISITION | ) | |
| HOLDINGS LLC, a Delaware limited liability | ) | |
| company, and MARK E. THOMAS, an | ) | |
| individual, SHARI E. REDSTONE, an | ) | |
| individual, ROBERT J. STEELE, an individual, | ) | |
| JOSEPH A. CALFIANO, an individual, | ) | |
| ROBERT N. WAXMAN, an individual, | ) | |
| WILLIAM C. BARTHOLOMAY, an | ) | |
| individual, and PETER C. BROWN, an | ) | |
| individual, | ) | |
| | ) | |
| Defendants. | ) | **Re Dkt Nos. 39, 42, 45 and 47** |

## OPINION ON
## MOTIONS TO DISMISS AND FOR ABSTENTION

**Counsel for the Official Committee of Unsecured Creditors/Plaintiffs**

| | |
|---|---|
| RICHARDS, LAYTON & FINGER, P.A. | MILBANK, TWEED, HADLEY & McCLOY LLP |
| Mark D. Collins, Esquire | Linda Dakin-Grimm, Esquire |
| Marcos A. Ramos, Esquire | David B. Zolkin, Esquire |
| Wilmington, DE 19801 | Los Angeles, CA 90017 |

**Counsel for National Amusements, Inc., Sumco, Inc.,**
**Sumner M. Redstone 2003 Trust, and Sumner M. Redstone/Defendants**

| | |
|---|---|
| YOUNG CONAWAY STARGATT | SHERMAN & STERLING LLP |
| & TAYLOR LLP | Stuart J. Baskin, Esquire |
| David C. McBride, Esquire | Jaculin Aaron, Esquire |
| Pauline K. Morgan, Esquire | New York, NY 10022 |
| Wilmington, DE 19899 | |

**Counsel for the Independent Directors/Movants**

| | |
|---|---|
| MORRIS, NICHOLS, ARSHT | DEWEY & LEBOEUF LLP |
| & TUNNELL LLP | Richard W. Reinthaler, Esquire |
| Jon E. Abramczyk, Esquire | Timothy Q. Karcher, Esquire |
| Wilmington, DE 19899 | New York, NY 10019 |

**Counsel for Shari E. Redstone and Robert J. Steele/Defendants**

| | |
|---|---|
| SAUL EWING LLP | MINTZ, LEVIN, COHN, FERRIS, GLOVSKY |
| Mark Minuti, Esquire | AND POPEO, P.C. |
| Wilmington, DE 19899 | Elizabeth B. Burnett, Esquire |
| | Boston, MA 02111 |

# I.  **INTRODUCTION**[1]

The Official Committee of Unsecured Creditors (the "Committee") brought this adversary action to recover alleged damages to the estate of Midway Games Inc. and affiliates (the "Debtor" or "Midway")[2] resulting from several financial transactions.  The defendants ("Defendants") are: (i) Shari E. Redstone ("Ms. Redstone"), Robert J. Steele ("Steele"), Joseph A. Califano, Robert N. Waxman, William C. Bartholomay, Peter C. Brown (collectively, the "Board Defendants"); and (ii) Debtor's former controlling shareholders, National Amusements, Inc. ("NAI"), NAI Sumco, Inc., Sumner M. Redstone 2003 Trust , and Sumner M. Redstone ("Mr. Redstone") (collectively the "Redstone Defendants"). The Committee claims in its 56 page, 22 claim, 285 paragraph Amended Complaint (the "Amended Complaint" or "Am. Compl.") that both the Board Defendants and Redstone Defendants either approved, acquiesced or aided and abetted in two transactions: a $90 million loan from the Redstone Defendants ("the NAI Loan"), and a $40 million factoring agreement with NAI (the "Factoring Agreement") (collectively, the "Challenged Transactions") with the result that Midway acquired additional debt instead of taking steps to seek alternative transactions, restructure or seek bankruptcy relief.  The Challenged

---

[1]  "The court is not required to state findings or conclusions when ruling on a motion under Rule 12. . . ." Fed. R. Bankr. P. 7052(a)(3).  Accordingly, the Court herein makes no findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

[2]  The debtor entities in this Chapter 11 case include: Midway Games Inc., Midway Home Entertainment Inc., Midway Amusements Games, LLC, Midway Interactive Inc., Surreal Software Inc., Midway Studios-Austin Inc.,Midway Studios-Los Angeles Inc., Midway Games West Inc., Midway Home Studios Inc., Midway Sales Company, LLC.

Transactions have led the Committee to conclude that the Board Defendants put both their own interests and the interests of the Redstone Defendants above what was best for Debtor's survival and thereby breached their fiduciary duties of care and loyalty. The Committee also challenges several transfers which it seeks to avoid.

The Court has before it the motions to dismiss (the "Motions") of (1) defendants William C. Bartholomay, Peter C. Brown, Joseph A. Califano, and Robert N. Waxman (collectively, the "Independent Directors") (D.I. 42); (2) the Redstone Defendants (D.I. 47); and (3) Ms. Redstone and Steele ("Redstone/Steele") (D.I. 39). The parties fully briefed the Motions and the Court heard oral argument on November 17, 2009. For the reasons that follow, the Motions are granted in part and denied in part. The Defendants have also moved for the Court to abstain from deciding certain of the claims. The Court is dismissing the claims subject to the abstention motion and, accordingly, will not decide Defendants' request.

## II. <u>JURISDICTION</u>

The Court's jurisdiction rests upon 28 U.S.C. §§ 157(b)(1) and 1334(b) and (d). The adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B) and (O).

## III. <u>FACTS</u>

Midway was a video game manufacturer, publisher and developer headquartered in Illinois, and is a Delaware corporation. Am. Compl. ¶ 2. It was best known for developing and producing "Mortal Kombat." Until the end of November 2008, the Redstone Defendants owned an 87.2 percent interest in the Debtor. Am. Compl. ¶ 28. The Independent Directors,

Ms. Redstone (daughter of Mr. Redstone), and Steele, an officer of NAI (Vice President of Strategy and Corporate Development), constituted the Debtor's Board.[3] Am. Compl. ¶¶ 18-26 and ¶ 29. The Independent Directors received compensation in the form of annual retainers and meeting fees. Am. Compl. ¶ 93.

The Independent Directors received $979,211 in compensation during the prepetition years of 2008 and part of 2009, as follows (Am. Compl. ¶ 93):

| | |
|---|---|
| Bartholomay: | $202,000 in 2008 and $42,298 in 2009; |
| Brown: | $210,413 in 2008; |
| Califano: | $220,500 in 2008 and $45,875 in 2009; and |
| Waxman: | $212, 500 in 2008 and $45,625 in 2009. |

### Wells Fargo and the 2005 and 2006 Noteholders

Debtor failed to record a profit beginning in 2001, and subsequently offered convertible notes through private placements to hedge funds to raise capital. Am. Compl. ¶¶ 30, 31. By the end of September 2007, Debtor had $150 million in outstanding notes (collectively the "Notes" and "Noteholders"). Am. Compl. ¶ 31. In addition to the Notes, Debtor owed $20 million in loan obligations due under a secured loan agreement with Wells Fargo ("the Wells Fargo Facility").

---

[3] While all parties agree that Ms. Redstone and Steele, as officers, are not independent directors in the Challenged Transactions, the parties dispute whether Bartholomay, Brown, Califano, and Waxman, are independent directors, particularly Califano and Brown. Mr. Redstone appointed Califano to the board of CBS and Brown as board co-chair and chief executive officer of MovieTickets.com, both of which Mr. Redstone controls. Am. Compl. ¶ 29.

## The NAI Loans

Debtor discovered in early 2008 that it needed additional funding to satisfy a liquidity covenant in the Wells Fargo Facility. Am. Compl. ¶ 32. Debtor hired Ernst & Young ("E&Y") to audit Debtor's businesses. Am. Compl. ¶ 33. During its audit, E&Y told Debtor that if Debtor was unable to satisfy the liquidity covenant, it would include a "going concern qualifier" in its 2007 fiscal year audit opinion. Am. Compl. ¶ 33. Without a "clean" audit from E&Y, Debtor would not be able to secure additional financing and would be unable to operate. For these reasons, Debtor approached NAI, which agreed to provide enough financing not only to replace the Wells Fargo Facility, but also to satisfy E&Y's liquidity concerns. Am. Compl. ¶¶ 33 & 34. On January 15, 2008, Debtor formed an independent committee ("Special Committee") of its Board, comprised of the Independent Directors, to supervise negotiations with NAI. Am. Compl. ¶ 35. Negotiations resulted in the NAI Loan of $90 million.[4]

## NAI Factoring Agreement

Over the course of the next several months, Debtor's businesses continued to suffer, now with the additional weight of the credit crisis and recession. In April 2008, Debtor's management informed the Board that it had decided to delay the release date of one of the new video games, which would likely cause a cash deficiency of $28 million to $32 million

---

[4] The NAI Loans consisted of three components: (1) $30 million secured facility ($20 million term and $10 million revolver) which replaced the Wells Fargo Facility, (2) $40 million unsecured revolving loan, and (3) $20 million unsecured subordinated revolving loan. Am. Compl. ¶¶ 46-47.

in September and October 2008. Am. Compl ¶¶ 53-57. In order to compensate for this deficit, Debtor asked NAI to enter into the factoring agreement whereby Debtor would allocate receivables in exchange for immediate financing. Am. Compl. ¶¶ 57-65. The Factoring Agreement took effect in September 2008, and provided Debtor with financing up to $40 million. Am. Compl. ¶ 167.

### Sale of NAI's Interest in Midway

On November 14, 2008, the Redstone Defendants approached Mark E. Thomas ("Thomas"), and proposed to sell him their controlling stock interest in Debtor and $70 million of the $90 million NAI Loan. On November 21, 2008, Thomas made an offer to pay $1 million in exchange for the Redstone Defendants' 87 percent of Debtor's common stock. Am. Compl. ¶ 76. However, after learning that the Redstone Defendants would not indemnify him for claims of unjust enrichment and corporate waste, Thomas lowered his offer to $100,000.00. Am. Compl. ¶ 77. Without making a counter offer, the Redstone Defendants agreed to the purchase price and executed the agreement with Thomas on November 28, 2008.[5] Am. Compl. ¶ 77-79 (the "Thomas Transaction"). The Thomas Transaction caused Debtor to lose some or all of $700 million in net operating losses and tax attributes that Debtor could have used for federal income tax purposes or that might have attracted a purchaser or partner. At the same time, the Redstone Defendants availed themselves of tax losses from the Thomas Transaction. (Am. Compl. ¶¶ 82-85).

---

[5] The actual purchaser was Acquisition Holdings Subsidiary 1, LLC, ("AHS") which Thomas formed and controlled.

**Debtor's Chapter 11 Filing**

Debtor filed voluntary Chapter 11 petitions in this Court on February 12, 2009. (D.I. 1). Debtor immediately filed a motion for use of cash collateral (the "Cash Collateral Motion"). (D.I. 14). The Court entered an Interim Order, but because the Thomas Transaction raised "red flags," the Interim Order only allowed use of cash collateral for fees, expenses, or causes of action relating to the "validity, enforceability, perfection, or priority of the prepetition liens and security interests" of the Debtor's prepetition obligations. (D.I. 41). The Court conducted an evidentiary hearing on the Cash Collateral Motion on February 17, 2009. (D.I. 41). After hearing and considering the evidence, the Court entered a Final Cash Collateral Order which also authorized the Committee to investigate or prosecute, on behalf of the Debtor's estate, any claims arising out of or relating to Debtor's loans from NAI, NAI's sale of its ownership interest in Debtor to Thomas or any action or omission of any insider or affiliate of the Debtor including, but not limited to, NAI, AHS or any other affiliate, insider, or shareholder of the Debtor. (D.I. 251).

In the course of the Chapter 11 case, Debtor sold substantially all of its assets to Warner Bros. Entertainment (the "Sale"). The Court approved the Sale for $35.7 million on July 1, 2009. Am. Compl. ¶ 103.

**The Committee's Standing**

At the conclusion of the hearing on the Cash Collateral Motion, the Court granted the Committee's oral motion for standing to assert claims in the face of the alarming Thomas

Transaction. In so holding, the Court responded to what it perceived to be a potentially fraudulent sale to Debtor's detriment, and apparent inaction by Debtor. The Committee acted swiftly in response to the Court's concern about the propriety of a transaction in which Thomas, a person of relatively modest means in the corporate world, purchased control of the Debtor and $70 million of debt for $100,000.

The Motions and the Committee's response address the "colorable claim" inquiry which the Court would have had to resolve had the Independent Directors contested the Committee's standing. Although the Court did not decide the requisite cost/benefit question which is a factor in determining standing, the potential recovery clearly and greatly outweighs the cost. Since the Court's adjudication of the Motions has provided ample opportunity to determine the likelihood of success and cost/benefit elements to grant standing, the Court is satisfied that it properly granted standing to the Committee. *Compare In re STN Enters.*, 779 F.2d 901 (2d Cir. 1985), and *MIG, Inc.*, Case No. 09-12118(KG) (Memorandum Order) (Del. Bankr. Dec. 18. 2009).

## Adversary Proceeding

On May 11, 2009, armed with standing, the Committee filed the Complaint which essentially challenged the Thomas Transaction and the NAI Loans. The Defendants filed motions to dismiss. Rather than file a response to these motions, the Committee filed the Amended Complaint. (D.I. 35). Defendants have now moved to dismiss the Amended Complaint.

# IV. **DISCUSSION**

Defendants seek dismissal of all claims ("Claims" or "Claim," as appropriate) for relief in the Amended Complaint pursuant to F.R.Civ.P. 12(b)(6) and F.R.Bankr.P. 7012, for failure to state a claim upon which relief can be granted. The question, therefore, is whether the Committee has sufficiently alleged facts which, if proven, entitle it to relief. If so, the Committee will have an opportunity to prove the Claims after discovery. The Claims state the Committee's effort to recharacterize both the NAI Loan and Factoring Agreement, avoid preferential and fraudulent transfers pursuant to 11 U.S.C. §§ 544, 547, 548 and 550, recover for breaches of fiduciary duties and aiding and abetting those breaches, and to obtain equitable subordination. The following chart summarizes the Amended Complaint:

| CLAIM | NATURE OF CLAIM | DEFENDANTS |
|---|---|---|
| First | Recharacterization | NAI |
| Second | Actual Fraudulent Transfer § 548(a)(1)(A) | NAI |
| Third | Constructive Fraudulent Transfer § 548(a)(1)(B) | NAI |
| Fourth | Actual Fraudulent Transfer § 544 | NAI |
| Fifth | Constructive Fraudulent Transfer § 544 | NAI |
| Sixth | Preference § 547 | NAI |
| Seventh | Recharacterization | NAI |
| Eighth | Actual Fraudulent Transfer § 548(a)(1)(A) | NAI |
| Ninth | Constructive Fraudulent Transfer § 548(a)(1)(B) | NAI |
| Tenth | Actual Fraudulent Transfer § 544 | NAI |
| Eleventh | Constructive Fraudulent Transfer § 544 | NAI |

| Twelfth | Preference § 547 | NAI |
|---------|------------------|-----|
| Thirteenth | Constructive Fraudulent Transfer § 548 | Board Defendants |
| Fourteenth | Constructive Fraudulent Transfer § 544 | Board Defendants |
| Fifteenth | Preference § 547 | Board Defendants |
| Sixteenth | Breach of Fiduciary Duty | Board Defendants |
| Seventeenth | Breach of Fiduciary Duty | Redstone Defendants |
| Eighteenth | Breach of Fiduciary Duty | Redstone Defendants |
| Nineteenth | Breach of Fiduciary Duty | Redstone Defendants |
| Twentieth | Aiding and Abetting Breach of Fiduciary Duty | Board Defendants |
| Twenty First | Aiding and Abetting Breach of Fiduciary Duty | Redstone Defendants |
| Twenty Second | Equitable Subordination | NAI |

## Rule 12(b)(6) Standard of Review

A motion to dismiss pursuant to Rule 12(b)(6) serves to test the sufficiency of the factual allegations in a plaintiff's complaint. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007); *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). To survive a motion to dismiss under Rule 12(b)(6), a plaintiff's complaint must contain sufficient "factual allegations" which, if true, would establish "plausible grounds" for a claim: "the threshold requirement . . . [is] that the 'plain statement' possess enough heft to 'sho[w] that the pleader is entitled to relief.'" *Twombly*, 550 U.S. at 557. However, "labels and conclusions" or "formulaic recitation of the elements of a cause of action" are not sufficient. *Id.* at 555. Legal conclusions are not entitled to the presumption of truth. *Ashcroft v. Iqbal*, 129 S. Ct. 1937,

1949 (2009). In deciding a motion to dismiss under Rule 12(b)(6), a court tests the sufficiency of the factual allegations and evaluates whether a plaintiff is "entitled to offer evidence to support the claims," and "not whether a plaintiff will ultimately prevail." *Oatway v. Am. Int'l Group, Inc.*, 325 F.3d 184, 187 (3d Cir. 2003). This is true even if "actual proof of those facts is improbable" and "a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556.

As discussed above, the Court must accept as true all allegations in the Amended Complaint and draw reasonable inferences in a light most favorable to the plaintiff. *Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008); *Morse v. Lower Merion School District*, 132 F.3d 902, 905 (3d Cir. 1997). However, "a court need not credit a plaintiff's 'bald assertions' or 'legal conclusions' when deciding a motion to dismiss." *Sands v. McCormick*, 502 F.3d 263, 267-68 (3d Cir. 2007) (quoting *Morse*, 132 F.3d at 906).

## Applicable Law

The internal affairs doctrine provides that only the state of incorporation has the authority to regulate a corporation's internal affairs. *Edgar v. MITE Corp.*, 457 U.S. 624, 645 (1982). "Few, if any, claims are more central to a corporation's internal affairs than those relating to alleged breaches of fiduciary duties by a corporation's directors and officers." *In re Fedders North America, Inc.*, 405 B.R. 527, 539 (Bankr. D. Del. 2009) (citing *In re Topps Co. Shareholders Litigation*, 924 A.2d 951 (Del. Ch. 2007)). The claims addressing breaches of fiduciary duties and related claims involve the internal affairs of Debtor, and the laws of

the state of incorporation control. The Court will therefore apply Delaware law in its decision. The remaining claims are subject to the Bankruptcy Code.

## A.  FIDUCIARY DUTY CLAIMS

### Breach of Fiduciary Duty Claims Against the Board
### Defendants Including the Independent Directors
### (Claim Sixteenth)

Directors of a Delaware corporation have a triad of fiduciary duties to uphold: the duties of care, loyalty, and good faith.  These fiduciary responsibilities do not operate intermittently and are "one of the most important methods of regulating the internal affairs of corporations, as these cases articulate the equitable boundaries that cabin directors' exercise of their capacious statutory authority." *In re Topps Co. Shareholders  Litig.*, 924 A.2d 951, 960 (Del. Ch. 2007).  The Committee alleges that the Board Defendants intentionally abandoned their fiduciary duties and instead served the best interests of the Redstone Defendants which resulted in breaches of the duties of care, loyalty and good faith. In supporting its claims, the Committee references instances of alleged misconduct by the Board Defendants surrounding the NAI Loan and Factoring Agreement, including the failure to: (1) seek independent third-party financing; (2) consider seeking bankruptcy protection or an out-of-court restructuring; (3) analyze Debtor's solvency and evaluate Debtor's capacity to support any additional debt; (4) investigate any potential errors in Debtor's books and records; and (5) hire independent professionals to analyze the fairness of the NAI Loan and the Factoring Agreement, and alternatives.

The Board Defendants contend that the Amended Complaint lacks sufficient facts to overcome the presumptions of the business judgment rule. Additionally, the Board Defendants argue that they are exculpated from personal liability because Debtor's certificate of incorporation contains a provision that, when read in conjunction with the Delaware General Corporation Law, 8 Del. C. § 102(b)(7), requires the Court to dismiss the duty of care claims. Section 102(b)(7) provides:

> (b) In addition to the matters required to be set forth in the certificate of incorporation by subsection (a) of this section, the certificate of incorporation may also contain any or all of the following matters:
>
> \* \* \*
>
> (7) A provision eliminating or limiting the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, provided that such provision shall not eliminate or limit the liability of a director: (i) For any breach of the director's duty of loyalty to the corporation or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; (iii) under § 174 of this title; or (iv) for any transaction from which the director derived an improper personal benefit. . . .

The breach of fiduciary duty claims against the Board Defendants are derivative claims as the Committee stands in the shoes of Midway. As such, the claims are limited to harm which Debtor, not the creditors directly, suffered from the Challenged Transactions. The issue, therefore, is how the Challenged Transactions, which provided Debtor with cash it desperately needed, harmed Debtor, not how they directly harmed creditors. More to the

point, what facts does the Committee advance to demonstrate that the Board Defendants breached duties leading to injury to the Debtor?

The Amended Complaint contains the following specific factual allegations:

1.      The Redstone Defendants controlled Midway at the time of the Challenged Transactions.  Am. Compl. ¶ 28-29.

2.      Midway was in severe financial distress when the Challenged Transactions occurred.  Am Compl. ¶¶ 30-34.

3.      The Board Defendants, including the Independent Directors, did nothing to determine Debtor's solvency, or hire a restructuring professional.

4.      During the relevant time period, the Redstone Defendants' media empire was on the brink of financial collapse.  The Redstone Defendants therefore commenced the liquidation of their controlling stake in Midway in order to claim over $700 million in tax losses.  Am. Compl. ¶¶ 70-71.

5.      The Thomas Transaction accomplished the Redstone Defendants' strategy. They sold their controlling interest and $70 million debt for the distress price of $100,000, thereby placing in control of Midway a wholly unsuitable and unknown individual.  Am. Compl. ¶¶ 74-75.  The Redstone Defendants did not seek a qualified, strategic purchaser.

6.     As the Redstone Defendants were benefitting from the substantial tax benefits arising from the Thomas Transaction, Debtor was losing tax attributes because of the change of control.  The Board Defendant's failure to consider the Debtor's solvency status or to retain a restructuring professional meant that the Board Defendants never considered the use of its most potentially valuable assets, its tax attributes.  Am. Compl. ¶ 82-86.

7.     Ms. Redstone resigned as director of Midway shortly before the Thomas Transaction and Steele resigned shortly after.  Am. Compl. ¶¶ 69 and 80.

8.     The Debtor's Board appointed the Independent Directors to investigate possible financing arrangements between Debtor and NAI.  Am. Compl. ¶ 35.  However, the Board Defendants did not authorize them to seek other financing, or consider and propose alternatives.  Am. Compl. ¶ 36.  In considering the means for the Redstone Defendants to provide funds to Midway, the Independent Directors analyzed the consequence to the Redstone Defendants.  Am. Compl. ¶ 37.  The transaction took the form of the NAI Loan rather than an equity infusion – better for the Redstone Defendants but not for Midway.  Am. Compl. ¶ 37.

9.     The Independent Directors also deferred to Ms. Redstone/Steele to negotiate the terms of the Challenged Transactions, despite their relationship to the Redstone Defendants.  Am. Compl. ¶ 39.  The Amended Complaint also provides that Ms. Redstone and Mr. Steele, both conflicted directors, received  "a mandate from the Special Committee . . . to negotiate an unrestricted $30 million infusion of cash into Midway [and]. . .

notwithstanding their supposed separation from the functions of the Special Committee–interacted frequently with NAI representatives on [Debtor's] behalf." The Amended Complaint further provides that both Ms. Redstone and Mr. Steele "nevertheless undertook substantial efforts to assist [Debtor] and NAI to consummate these transactions." Am. Comp. ¶¶ 39, 47.

The facts do not rise above the substantial legal hurdles facing the Committee. Delaware law gives great deference to management. The Committee's difficulty is accentuated by its concession that the terms of the Challenged Transactions were fair and at market rates. Moreover, there are no factual allegations that the Board Defendants profited personally.

The clear upshot of the Committee's claims against the Board Defendants is that Midway should have filed for bankruptcy rather than enter into the Challenged Transactions. Delaware law does not support such claims. The Delaware Court of Chancery and the Delaware Supreme Court, the Nation's preeminent authorities on corporate law, interred "deepening insolvency" as a cause of action in *Trenwick Am. Litigation Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168 (Del. Ch. 2006), *aff'd*, 931 A.2d 438 (Del. 2007). In rejecting the claim that the directors breached their fiduciary duties to creditors by failing to consider a bankruptcy filing, instead incurring additional debt, the Vice Chancellor concluded:

> It is no doubt regrettable that Trenwick . . . became insolvent. That insolvency no doubt injured their stockholders, creditors, customers, and employees. But the mere fact of a business failure does not mean that a plaintiff can state claims against the

> directors, officers, and advisors on the scene just by pointing out
> that their business strategy did not pan out. If simple failure
> gave rise to claims, the deterrent to healthy risk taking by
> businesses would undermine the wealth-creating potential of
> capitalist endeavors. For that reason, our law defines causes of
> action that may be pled against business fiduciaries and advisors
> with care, in order to balance society's interest in promoting
> good-faith risk-taking and in preventing fiduciary misconduct.
> The Litigation Trust has failed to meet its burden to plead facts
> stating claims of that kind against the defendants in this case.

*Trenwick*, 906 A.2d at 218. The Vice Chancellor therefore dismissed the litigation trust's

complaint, holding that the business judgment rule protects good faith, disinterested business

decisions from claims of creditors, even of an insolvent corporation. *Id.* at 195 n. 75

Similarly, this Court recently dismissed claims brought by a creditors committee

against, *inter alia*, the prepetition directors. In *Official Comm. of Unsecured Creditors of

Fedders North America, Inc. v. Goldman Sachs Credit Partners L.P.* ( *In re Fedders North

America, Inc.*), 405 B.R. 527 (Bankr. D. Del. 2009), Judge Shannon, on facts similar to the

facts here, dismissed the committee's complaint, citing *Trenwick*. In *Fedders*, a previously

successful business found itself in a liquidity crisis and borrowed $90 million. The company

soon filed for bankruptcy and the committee charged the directors with breaching their

fiduciary duties by delaying the unavoidable bankruptcy. Judge Shannon reasoned,

consistent with controlling Delaware law, that directors are within the appropriate exercise

of their judgment in taking steps to continue the firm's operations in an effort to expand the

potential for creditor recovery. *Fedders*, 405 B.R. at 541- 43.

*Trenwick* and *Fedders* are entirely consistent with a line of cases holding that directors are not liable for decisions they make and actions they take in an effort to prolong the corporation's viability, even in the face of insolvency. In *North American Catholic Education Programming Foundation, Inc. v. Gheewalla*, 930 A.2d 92 (Del. 2007), the Delaware Supreme Court held that directors do not have a duty to protect creditors of an insolvent corporation at the expense of the corporation and its shareholders.[6] This Court also has rejected deepening insolvency as a valid claim. *See Fedders* and *In re Radnor Holdings Corp.*, 353 B.R. 820 (Bankr. D. Del. 2006).

The law is thus settled that directors do not have a duty to creditors of an insolvent corporation to abandon the effort to rehabilitate the corporation in favor of creditors' interests. A claim based on deepening insolvency must fail even if, as here, an aggrieved creditor attempts to side-step the rejected legal claim. Where, as here, the Committee calls "a discredited deepening insolvency cause of action by some other name," the claim must, too, be rejected. *Radnor*, 353 B.R. at 842. The Amended Complaint simply does not allege sufficient facts which, taken as true, sustain the Committee's claim that the Board Defendants can be held liable for a breach of the duty of care, even in the absence of an exculpation provision in the certificate of incorporation. It therefore follows that the Committee has failed to state a claim for gross negligence or reckless disregard of their

---

[6] The Court discusses the claims against the Redstone Defendants, the controlling shareholders, within. The significance of *Gheewalla* to the Committee's claims here is powerful. For if directors do not have a duty to protect creditors, a controlling shareholder certainly does not.

duties, which carry a heavier burden. The Court finds that the duty of care claims are in reality claims of deepening insolvency and are not sustainable.

In addition to failing to state a claim under Delaware law, the Committee also faces the hurdle that Debtor's Certificate of Incorporation contains an exculpation clause for breaches of the duty of care in accordance with Section 102 (b)(7) of the Delaware General Corporation Law, 8 Del. C. § 102 (b)(7). Article Eighth of Debtor's certificate of incorporation provides:

> To the fullest extent permitted by the General Corporation Law of the State of Delaware, as the same may be amended and supplemented, no director shall be personally liable to the Corporation or its stockholders for monetary damages for fiduciary duty as a director.
>
> (D.I. 44 at 5).

Section 102(b)(7) of the Delaware General Corporation Law permits a corporation, by so providing in its certificate of incorporation, "to protect its directors from monetary liability for duty of care violations, i.e., liability for gross negligence." 5 Balotti & Finkelstein, *The Delaware Law of Corporations and Business Organizations*, Ch. 4, § 4.19, p. 200.10 (1986); *see also John Hancock Capital Growth Management Inc. v. Aris Corp.*, Del. Ch., C.A. No. 9920, Jacobs, V.C., Mem.Op. at 4 (Aug. 24, 1990).

One of the primary purposes of section 102(b)(7) is to encourage directors to undertake risky, but potentially value-maximizing, business strategies, so long as they do so in good faith. *Prod. Res. Group, L.L.C. v. NCT Group, Inc.*, 863 A.2d 772, 777 (Del. Ch.

2004).  However, exculpation clauses do not eliminate personal liability without limitation.

The Delaware Supreme Court has held[7] that when a duty of care breach is not the exclusive

claim, a court may not dismiss based solely upon an exculpatory provision.  The Delaware

Supreme Court stated in *Emerald Partners*:

> [T]he shield from liability provided by a certificate of
> incorporation provision adopted pursuant to 8 Del.C. §
> 102(b)(7) is in the nature of an affirmative defense.  Defendants
> seeking exculpation under such a provision will normally bear
> the burden of establishing each of its elements . . . . Nonetheless,
> where the factual basis for a claim solely implicates a violation
> of the duty of care, this Court has indicated that the protections
> of such a charter provision may properly be invoked and
> applied.

*Emerald Partners*, 726 A.2d at 1223-24.

Exculpation clauses also constitute affirmative defenses according to the Court and

the Third Circuit Court of Appeals.  "The exculpation clause is an affirmative defense and

the determination of the viability of that defense is not proper at [the dismissal] stage." *In

re The Brown Schools*, 368 B.R. 394, 401 (Bankr. D. Del. 2007); see also *In re Tower Air,

Inc.*, 416 F.3d 229, 238, 242 (3d Cir. 2005) (stating that exculpation provisions are

affirmative defenses that generally can not form the basis of a Rule 12(b)(6) dismissal).

However, where a complaint does not adequately contain facts supporting a claim that

directors acted in bad faith or conscious disregard of their responsibilities, Rule 12 (b)(6)

dismissal is appropriate.  *Malpiede v. Towson*, 780 A.2d 1075, 1093 (Del. 2001); *In re*

---

[7] *Malpiede v. Towson*, 780 A.2d 1075, 1090-96 (Del. 2001); and *Emerald Partners v. Berlin*, 787 A.2d 85 (Del. 2001).

*Lukens Inc. Shareholders Litigation*, 757 A.2d 720, 233-34 (Del. Ch. 1999), aff'd *sub nom*. *Walker v. Lukens, Inc.*, 757 A.2d 1278 (Del. 2000). *See also*, *In re Caremark Int'l Deriv. Lit.*, 698 A.2d 959, 971 (Del. Ch. 1996), requiring a plaintiff to show a "sustained or systematic failure of the board to exercise oversight. . . ."

The court in *Caremark* defined "a sustained or systematic failure" as either an utter failure to implement reporting or information controls or a conscious failure to monitor, "thus disabling [the fiduciaries] from being informed of risks or problems requiring their attention." *Id.* at 970. The Board Defendants were active in managing Debtor's affairs, as even the Amended Complaint describes.

> The Independent Directors "considered different ways for the Redstone Defendants to inject capital into [Debtor]." [Am. Compl. ¶ 37].

> The Independent Directors sought out interested third parties, not only the Redstone Defendants, for the Factoring Transaction, only one of which made an offer but on less favorable terms. [Am. Compl. ¶ 57.]

The Court concludes, based on the Amended Complaint, that the Committee does not have sufficient facts to create a plausible claim that the Board Defendants violated their fiduciary duty of care. To the extent the Board Defendants did, the exculpation clause in Midway's certificate of incorporation shields them from liability.

### Duty of Loyalty and Good Faith

The Court's inquiry does not end with a finding that the Board Defendants are insulated from duty of care liability, which is but one of the triad of duties. The Board

Defendants also had responsibility to perform their duties with loyalty and good faith.[8]

The duty of loyalty mandates that a corporate fiduciary act with "undivided and unselfish loyalty to the corporation" and that "there shall be no conflict between duty and self-interest." *Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del. 1983)(citing *Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. 1939). There are two ways to breach the duty of loyalty: (1) self-dealing and (2) failure of oversight. In this case, the Independent Directors did not stand on both sides of the NAI Loan and Factoring Agreement and therefore self-dealing is not a viable claim.

But even when board action does not involve self-dealing and the business judgment rule standard of review is applicable, a plaintiff can prevail by showing that the directors breached their duty of loyalty.  In the case of the duty of loyalty, the plaintiff does so by showing that board action was not undertaken in a good faith effort to further the stockholders' best interests, but for some personal reason, such as entrenchment.  If the plaintiff proves subjective bad faith of that kind, it can have the challenged action set aside in equity as a breach of the duty of loyalty and potentially recover monetary damages or other relief for the injury to the corporation.  *Harvard* at 18-19.  The duty of loyalty is implicated because the Committee has alleged that the Independent Directors violated their duties of

---

[8]  Leading experts on Delaware corporate law make a powerful case for the theory that good faith is at the core of the duty of loyalty and is not a separate duty.  The authors conclude that "good faith" is the "state of mind required of a loyal director." See Leo E. Strine, Jr., Lawrence A. Hammermesh, R. Franklin Balotti & Jeffery M. Gorris, Loyalty's Core Demand: The Defining Role of Good Faith in Corporation Law, at 4. (Widener Law Sch. Legal Studies Research Paper No. 09-13, Harvard Law & Econ. Discussion Paper No. 630, 2009), available at http://ssrn.com/abstract=1349971 ("*Harvard*").

oversight and good faith, as explained below.

As a subsidiary element of the duty of loyalty, a successful claim for the breach of the duty of good faith requires a plaintiff to demonstrate one of three actions: "1) where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation; 2) where the fiduciary acts with the intent to violate applicable positive law; or 3) where the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties." *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 67 (Del. 2006). Where directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities, they breach their duty of loyalty by failing to discharge their fiduciary obligations in good faith. *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006).

The Committee's claims rest upon the third category, failure to act, which describes the lack of good faith conduct that the *Caremark* Court held is "a necessary condition" for finding director oversight liability.

In the Motions, the Board Defendants argue that the alleged breach of the duty of good faith is meritless because their actions did not rise to a heightened level of "a complete and utter failure to act in the face of a known duty." *In re Caremark*, 698 A.2d at 971. To support this conclusion, the Board Defendants suggest that the Committee is alleging this breach solely because they disagree with the Independent Directors' decision not to seek bankruptcy relief sooner. The Independent Directors further provide that they were proactive

in trying to keep Debtors out of bankruptcy by: meeting 16 times; acquiring additional financing; succeeding in obtaining a clean audit opinion; addressing problems with Midway's cash forecasting system; approving the Factoring Agreement with NAI; and considering various methods to restructure Debtor's business.

The problem with the specific factual allegations is that taken individually or in combination, even assuming their truth, they do not plausibly demonstrate or create a basis for a finding of liability upon proof. The Challenged Transactions provided essential funding. The Committee does not allege that the terms of the Challenged Transactions were unfair or that the Board Defendants profited from them, a highly telling concession. The Committee does not allege that the form of the Challenged Transactions harmed Debtor as opposed to its creditors directly. As discussed in the following section of this opinion, the Redstone Defendants had the unfettered right to dispose of their Midway interests as they saw fit. Accordingly, the Board Defendants were powerless to prevent a change of control and thereby protect the tax attributes.[9] Although the Thomas Transaction was disturbing, the Board Defendants did not approve it and could not stop it.

The facts simply do not permit the Court to find that the Committee has stated a viable claim that the Board Defendants breached their duties of loyalty and good faith by a sustained or systematic failure of oversight. Although the Challenged Transactions may – or may not

---

[9] It remains unclear to the Court whether the Thomas Transaction in fact eliminated the availability of the tax attributes or whether they are still available but on a limited basis. Regardless, the NAI Defendants had the right to sell their interest in Midway and it made no difference whether the sale price was the $100,000 received in the Thomas Transaction, or $100 million.

– have buried the creditors beneath more debt than would have been the case had the Debtor filed for bankruptcy beforehand, the Committee has not alleged that Debtor suffered harm. The Redstone Defendants' infusion of money into the failing company did not damage Debtor, on whose behalf the Committee is acting. Accordingly, dismissal of the fiduciary duty claims against the Board Defendants is necessary and appropriate.

### Breach of Fiduciary Claims Against the Redstone Defendants
### (Claims Seventeenth, Eighteenth and Nineteenth)

The Committee alleges, on behalf of the Debtor, that the Redstone Defendants breached fiduciary duties to Debtor by engaging in the Challenged Transactions. It is important to emphasize what the Committee does not allege in the Amended Complaint: (1) there is no factual allegation that the terms were unfair and (2) no fact suggesting that the Redstone Defendants forced the Challenged Transactions upon Debtor. Instead, the Committee concedes that the Debtor approached the Redstone Defendants to obtain needed financing. Am. Compl. ¶¶ 39 and 54.

The Court has already ruled that the Board Defendants are not liable for the Committee's "deepening insolvency" claim. So, too, the Redstone Defendants can not be liable for a cause of action which does not have validity under Delaware law.

Unique to the Committee's claim that the Redstone Defendants breached their fiduciary duties to Debtor as controlling shareholders is the fact that Delaware law does not recognize such a claim. Controlling shareholders are entitled to advance their economic interests. *Jedwab v. MGM Grand Hotels, Inc.*, 509 A.2d 584, 598 (Del. Ch. 1986). *See also,*

*Odyssey Partners L.P. v. Fleming Companies, Inc.*, 735 A.2d 386, 410 (Del. Ch. 1999). In

*Fleming*, the shareholder plaintiff complained that the controlling shareholder had breached

its fiduciary duty to search for capital for the corporation. The court found the controlling

shareholder had not breached any duty to the corporation merely by acting in its self-interest.

The court quoted from an earlier decision in the *Odyssey* case, in which the Chancellor

stated:

> [F]iduciary obligation does not require self-sacrifice. More
> particularly, it does not necessarily impress its special limitation
> on legal powers held by one otherwise under a fiduciary duty,
> when such collateral legal powers do not derive from the
> circumstances or conditions giving rise to the fiduciary
> obligation in the first instance. Thus one who may be both a
> creditor and a fiduciary (e.g., a director or controlling
> shareholder) does not by reason of that status alone have special
> limitations imposed upon the exercise of his or her rights.

*See Odyssey Partners, L.P. v. Fleming Co.*, 1996 WL 422337, * 3 (Del. Ch. 1996) (citations).

*See also Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 173 (Del. Ch.

2006), wherein the court clearly stated that, "Parent corporations do not owe such

subsidiaries fiduciary duties. That is established Delaware law." The Committee does not

allege anywhere in the Amended Complaint that the Redstone Defendants forced the

Challenged Transactions upon Debtor or flexed their control to initiate or dictate the terms

of the Challenged Transactions. A controlling stockholder is liable under Delaware law only

when the controlling shareholder "causes the subsidiary to act in such a way that the parent

received something from the subsidiary to the exclusion of, and detriment to, the minority

stockholders of the subsidiary." *Sinclair Oil Corp. v. Levien*, 286 A.2d 717, 720 (Del. 1971).

*See also* Odyssey Partners II, 735 A.2d at 412, and *Puma v. Marriott, 238 A.2d 693, 695* (Del. Ch. 1971), both standing for the principle that a heightened scrutiny of a transaction between a parent and subsidiary, "entire fairness," is appropriate only when a controlling stockholder uses its control to negate the judgment of the subsidiary's independent board and both causes the transaction and dictates the terms. The Amended Complaint itself establishes that Midway, not the Redstone Defendants, decided through its board of directors to seek financial assistance which resulted in the Challenged Transactions.

The Board Defendants then negotiated and approved the terms of the NAI Loans and the Factoring Agreement. Thus, the situation at hand is a far cry from a controlling shareholder imposing a transaction on a subsidiary in the controlling shareholder's best interest. Here, the Redstone Defendants lost $90 million. They could have taken their tax losses without the additional losses of $90 million.[10]

### Aiding and Abetting Claim
### (Claims Twentieth and Twenty-First)

The Committee asserts in the Amended Complaint that the Board Defendants and the Redstone Defendants knowingly aided and abetted one another in breaches of fiduciary duty to the Debtor by encouraging, participating and approving the Challenged Transactions. The Committee bases the aiding and abetting charges on the claims that the Board Defendants

---

[10] Applying Delaware law, even the troublesome Thomas Transaction does not constitute a breach of fiduciary duty. The Redstone Defendants sale of their debt and controlling interest at a *de minimis* price to a person of relatively small means was not clearly an improper act. In any event, the Committee settled the Thomas Transaction issues.

and the Redstone Defendants breached fiduciary duties to the Debtor and its creditors. Am. Compl. ¶ 271. In response, the Board Defendants and the Redstone Defendants argue that they did not owe or breach any fiduciary duty to the Debtor.

To establish an aiding and abetting claim under Delaware law, a plaintiff must demonstrate: "(1) the existence of a fiduciary relationship; (2) a breach of a fiduciary duty; (3) knowing participation in the breach by a defendant who is not a fiduciary; and (4) damages proximately caused by the breach." *In re Transkaryotic Therapies, Inc.*, 954 A.2 346, 370 (Del. Ch. 2008) (citing *McGowan v. Ferro*, 859 A.2d 1012, 1041 (Del. Ch. 2004), *aff'd,* 873 A.2d 1099 (Del. 2005)).

The Court has already held that neither the Board Defendants nor the Redstone Defendants committed any breaches of fiduciary duties. It therefore must follow that the Committee can not sustain aiding and abetting claims.

## B. AVOIDANCE CLAIMS

### The Committee Has Standing to Assert
### The Avoidance Claims In The Complaint

As a preliminary matter, the Independent Directors purport that the Committee lacks standing on behalf of both the general unsecured creditors and the estate to bring any avoidance action pursuant to sections 544, 547 and 548 of the Bankruptcy Code (the "Code"). Specifically, the Independent Directors allege that only the trustee can bring avoidance claims against general unsecured creditors. They also contend the Committee lacks standing to bring claims derivatively against the estate because the Court did not grant them

27

proper authority to bring alleged claims. The Committee responds by asserting that the Court granted the Committee standing to bring avoidance claims and that any damages to Debtor's estate also damaged the Debtor's creditors.

The Court granted standing to the Committee in its April 9, 2009 Order. (D.I. 251 ¶ 8). Sections 544, 547, and 548 of the Code provide exclusive power to the trustee to pursue avoidance claims that meet the requirements of the statute unless the Bankruptcy Court grants standing to that party. In its Order, this Court granted broad derivative standing by ruling that the Committee can pursue "any and all claims against any party that arise out of, or relate to . . . any transaction by and between NAI or any of its affiliates . . . ." (D.I. 251 ¶ 8). The avoidance claims in the Amended Complaint "arise out of [and] relate to any transaction by and between NAI." Therefore, the Court finds that the Committee has standing to bring the avoidance claims.

### Insolvency

Applicable to all of the avoidance claims is the Defendants' argument that the Committee failed to allege sufficient facts to establish a claim for insolvency, which is an essential element of the avoidance claims. The Court disagrees. The Amended Complaint states the following facts which, taken as true, support a finding of insolvency:

- Midway lost more than $78 million by years end 2007. Am. Compl. ¶ 30.
- Midway was not paying its debts as they came due. Am. Compl. ¶ 31.
- Debtor had large trade debt, owed $150 million on the Notes, half of which was due in 2009. *Id.*
- Midway's liabilities far exceeded its assets by January 2008.

- Midway's management informed the Board Defendants that Midway was running out of cash and breaching a liquidity covenant in the Wells Fargo Facility. Am. Compl. ¶¶ 31-32.
- E&Y was preparing to issue a qualified going-concern valuation to the 2007 annual report. Am. Compl. ¶ 33.

The Committee's factual allegations, taken as true, provide enough detail of insolvency upon which to base the avoidance claims.

### Recharacterization Claim - Redstone Defendants
### (Claims First and Seventh)

The Committee seeks the recharacterization of the Challenged Transactions, i.e., (1) the $20 million unsecured portion of the NAI Loan from debt to equity and (2) the Factoring Agreement from a "true sale" to unsecured debt. Clearly, the Court has the power to do so. *Cohen v. KB Mezzanine Fund II* (*In re Submicron Sys. Corp.*), 432 F.3d 448 (3d Cir. 2006). The purpose of recharacterization is to give effect to the priority scheme of the Bankruptcy Code by elevating substance over form. The Committee alleges that in providing the NAI Loan Facility:

- NAI entered into the NAI Loan Facility when Midway was severely undercapitalized and overleveraged;
- Did not perform diligence; and
- Failed to investigate Debtor's solvency.

The Committee further alleges that in entering into the Factoring Agreement, the Redstone Defendants originally structured the Factoring Agreement as a secured loan but when they learned that the Notes indenture prohibited additional secured debt, the Redstone Defendants changed the transaction.

29

Recharachterization is, by its nature, a fact intensive inquiry. The Court is satisfied that the Committee has sufficiently pleaded facts which make dismissal at this stage inappropriate. The Challenged Transactions involved controlling shareholders, and the parties' intent is a factual issue properly pleaded.[11] The Amended Complaint contains allegations that the NAI Defendants transferred their stock in the Thomas Transaction for $100,000 and the NAI Loans. This gives rise to a fair inference that the NAI Loans were equity, as well. The Amended Complaint alleges that the Factoring Agreement was a ploy to implement the Redstone Defendants' making a loan to Midway which was the parties' intent.

### Equitable Subordination
### (Claim Twenty-Second)

The Committee seeks equitable subordination of the $20 million Insider Subordinated Facility[12] pursuant to 11 U.S.C. § 510(c)(1). The factors the Third Circuit Court of Appeals enunciated in *Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Claims*, 160 F.3d 982, 986-87 (3d Cir. 1998), are as follows:

(1)     inequitable conduct,

(2)     injury to creditors or unfairly giving unfair
         advantages to a Debtor, and

---

[11] The value of the claim and the logic behind pressing it are highly questionable. There are $150 million in notes and general unsecured claims ahead of the $20 million obligation to NAI.

[12] The "Insider Subordinated Facility" refers to the $20 million facility comprising a portion of the $90 million NAI Loan. The Insider Subordinated Facility was an unsecured loan which the NAI Defendants subordinated to bondholders' claims but not to the claims of other unsecured creditors.

(3)     the remedy, equitable subordination, must be consistent with the Bankruptcy Code.

The Committee has not stated facts which, if true, would justify a finding of inequitable conduct. The Court will dismiss the claim of equitable subordination.

## Constructive Fraudulent Transfer - Directors' Fees
## (Claims Thirteenth and Fourteenth)

The Committee alleges that the fees paid to the Independent Directors in 2008 and early 2009 were fraudulent transfers under the Bankruptcy Code and applicable state law.[13] Section 548(a)(1) of the Code provides in relevant part:

> The Trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily:
>
> (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation . . . .
>
> 11 U.S.C. § 548(a)(1).

The Delaware Uniform Fraudulent Transfer Act requires substantially the same showing. The only element of a fraudulent transfer which the Independent Directors dispute is whether the Debtors received less than reasonably equivalent value in exchange for the fees paid to the Independent Directors.

---

[13] Under section 544(b) of the Bankruptcy Code, "[T]he trustee may avoid any transfer of an interest of the debtor in property . . . that is voidable under applicable law . . . ." In this case, the Committee seeks to avoid the payments under the Delaware Uniform Fraudulent Transfer Act. See 6 Del. C. §§ 1304, 1305 (2009).

Neither Delaware nor federal statutes define "reasonably equivalent value." However, the Third Circuit has held that courts should define the scope and meaning of the term by conducting a totality of the circumstances analysis. *In re R.M.I., Inc.*, 92 F.3d 139, 153 (3d Cir. 1996). While conducting this analysis, the court in *R.M.I.* considered three factors: "(1) whether the transaction was at arm's length, (2) whether the transferee acted in good faith, and (3) the degree of difference between the fair market value of the assets transferred and the price paid." *Id.*

The Committee argues the determination of "reasonably equivalent value" is a fact-based question that cannot be addressed on a motion to dismiss and further asserts that if the Independent Directors contest the value of the fees, they can raise this objection at trial. The Independent Directors argue in response that, as a matter of law, this Court must conclude that value was given because the Amended Complaint lacks sufficient facts for a finding that the Independent Directors failed to perform the services for which they were compensated and therefore the fees paid were not excessive. Specifically, the Independent Directors contend that to determine whether the fees were excessive, the Court must compare the Independent Directors' fees with what comparable corporations pay their directors.

The Committee does not claim that the fees were excessive or extraordinary for Midway, i.e., outside the normal rate or paid on a different time table. The Court has also determined that the Committee has failed to state a claim that the Independent Directors are

liable for any wrongdoing. Therefore, the Court will dismiss the claims directed at the fees Debtor paid to the Independent Directors.

## Avoidable Preference Claim - Directors' Fees
## (Claim Fifteenth)

The Committee seeks to avoid and recover fees paid by the Debtor to the Independent Directors. The Independent Directors seek dismissal on the grounds that the payment of fees were made in the ordinary course of business subject to Code § 547(c)(2).

Section 547(b) provides that, "the trustee may avoid any transfer of an interest of the debtor in property . . . (1) to or for the benefit of a creditor; (2) for or on account of an antecedent debt owed by the debtor before such transfer was made; [and] (3) made while the debtor was insolvent . . . ." 11 U.S.C. § 547(b). Section 547(c)(2), however, provides for an exception for transfers made in the ordinary course of business:

(c) The Trustee may not avoid under this section a transfer . . .

(2) to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was–

(A) made in the ordinary course of business or financial affairs of the debtor and the transferee; or

(B) made according to ordinary business terms . . .

11 U.S.C. § 547(c)(2).

In the Committee's response to the Independent Directors' motion to dismiss, the Committee claims that the fees paid are avoidable because they were paid while the debtor

was insolvent under section 547(b)(3) and therefore do not fall within the "ordinary course of business" exception. In responding to this contention, the Independent Directors conclude that the payments of the fees were in the ordinary course of business because "no case has held that salaries paid to employees as work performed is subject to an avoidable preference action." (D.I. 43).[14]

Whether section 547(b)(3) trumps the ordinary course exception of section 547(c)(2) is a matter of first impression in the Third Circuit. No case in this circuit holds that fees paid by an insolvent debtor are not subject to the ordinary course exception. The Court finds that the ordinary course exception is applicable. An additional factor is that the Court has dismissed the breaches of fiduciary duties claims.

The holding is consistent with the legislative history of section 547(c)(2). Congress clearly intended for the ordinary course exception to apply to routine payments: "The purpose of this exception is to leave undisturbed normal financial relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy." H.R. Rep. No. 595, 95th Cong., 1st Sess. 373, *reprinted in* 1978 U.S. Code Cong. & Ad. News 5787, 6329. This language shows that Congress intended for § 547(b)(3) to override § 547(c)(2). The

---

[14] The Independent Directors add some spice to their argument by suggesting that the Committee "does not cite a simple reported decision in over 200 years of bankruptcy jurisdiction in which directors' fees have been avoided either as fraudulent transfers or preferences. D.I. 58 at 19. The Court notes that there is a first time for everything, but the facts do not justify making this case that first time. The continuing service of directors is obviously necessary and essential for a Delaware corporation.

34

Amended Complaint does not contain sufficient facts to show that the fees were anything other than in the realm of "normal financial relations" between Debtor and the Independent Directors.

**Fraudulent and Preferential Transfer Claims - Challenged Transactions
(Claims Second through Sixth and Eighth through Twelfth)**

The Committee complains that the Redstone Defendants are guilty of fraudulent and preferential transfers involving the Challenged Transactions. The Committee advances two theories for relief, actual and constructive fraud and Bankruptcy Code Section 547.

### 1. Actual Fraud

The Committee claims that under Code Sections 544 and 548 and Delaware law[15] the Challenged Transactions constitute actual fraudulent transfers. The transfers in question are the payments to the Redstone Defendants, NAI in particular, on the Challenged Transactions.

A plaintiff charging a violation under Section 548(a)(1) must prove that the transferor, here the Debtor, made the transfer with the "actual intent to hinder, delay or defraud creditors. *In re Pinto Trucking Serv., Inc.,* 93 B.R. 379, 386 (Bankr. E.D. Pa. 1988). In determining "intent," courts look for "badges of fraud," which include:

> (i) the relationship between the debtor and the transferee; (ii) consideration for the conveyance; (iii) insolvency or indebtedness of the debtors; (iv) how much of the debtor's estate was transferred; (v) reservation of benefits; control or dominion by the debtor over the property transferred; and (iv) secrecy or concealment of the transaction.

---

[15]   Delaware law, 6 Del. C. § 1304(b)(1) contains the same standard for fraudulent transfer as the Code, namely the "actual intent to hinder, delay or defraud." The Court will therefore consider the applicable Bankruptcy Code provisions as incorporating Delaware law.

*In re Hechinger Inv. Co.*, *of Del.*, 327 B.R., 537, 551 (D. Del. 2005), aff'd on other grounds, 278 Fed. App'x 125 (3d Cir. 2008).

The Committee's claim fails to support their theory. The Committee does not allege secrecy or reservation of benefits. The transfers, $2.3 million of interest payments for $90 million of loan funds, and $497 thousand transferred for the $40 million advanced for the Factoring Agreement (Am. Compl. ¶ 66) do not support a claim of inadequate consideration. It is no wonder, therefore, that the Committee did not plead fraud with the particularity which F.R.Civ.P. 9(b) requires. As *Fedders* explains, if a plaintiff's only badge of fraud is insolvency it may "cast suspicion" on a transaction but is not sufficient. *Fedders*, 405 B.R. at 545-46.

## 2. <u>Constructive Fraud</u>

The Committee's claim pursuant to Code Section 548(a)(1)(B) requires proof that the transfers incidental to the Challenged Transactions resulted in no value for Midway or the value received was not "reasonably equivalent" to the relinquished property. *In re Freuhauf Trailer Corp.*, 444 F.3d 203, 210 (3d Cir. 2006). The facts which the Court discussed under the "Actual Fraud" heading and which appear on the face of the Amended Complaint are equally applicable here and require dismissal of the Claim, including the demand under Section 544 of the Code and Delaware law, 6 Del. C. §§ 1304(a)(2) and 1305.

### 3.  **Preferential Transfers**

The determination of whether payments to the Redstone Defendants associated with the Challenged Transactions depends upon the later rulings on recharacterization. Accordingly, the Court will not dismiss such claims.

## V.  **CONCLUSION**

The Court will dismiss all of the claims that the Defendants breached their fiduciary duties.  The decision is not an endorsement of any of the Defendants' actions.  The Defendants oversaw the ruin of a once highly successful company, only to hide behind the protective skirt of Delaware law, which the Court is bound to apply.  The claims for recovery for the Challenged Transactions are unable to traverse Delaware law's mine field of statutory exculpation, business judgment and the rejection of a "deepening insolvency" cause of action and the rights' of controlling shareholders.  Accordingly, the fiduciary duty claims are dismissed.  The Motions addressing the remaining claims brought under the Bankruptcy Code are granted in part and denied in part, as set forth in the accompanying Order.

Dated: January 29, 2010

KEVIN GROSS, U.S.B.J.